Froessel, J.
This is an action to recover for personal injuries claimed to have resulted from the administration by a hospital nurse of an intravenous injection of a dye used for X-ray purposes. Plaintiff was admitted to Morrisania City Hospital on September 19, 1951, acutely ill from a kidney ailment diagnosed as ureteral calculus and pyelonephritis. He was then 29 years old and had immigrated from Poland two years pre *228 viously. During that period he had been admitted to Morrisania on two other occasions, when he received treatment for the same ailment, including cystoscopy, intravenous pyelograms and an operation. Morrisania is a hospital operated by the City of New York on a nonprofit basis, although patients are charged for the care received. Plaintiff, however, had not yet paid the charges for any of his visits.
On admission, plaintiff was placed in a urology ward, containing approximately 40 or 50 patients, with one or two nurses and four resident physicians in attendance. On September 21 he was taken in a wheel chair to the cystoscopy room. He was to be given an intravenous pyelogram, known as an “ IVP ”, an injection of a dye into the vein in order to outline the kidney for X-ray purposes. The only persons in the room were another patient and a nurse, Miss Stensch.
Miss Stensch was a paid city employee in charge of the cystoscopy room. She had been a registered nurse for 20 years and had been at Morrisania for 13 years, the last two of which were spent in charge of the cystoscopy room. Her function in that position was “ to see that everything is run properly in that room ”, to assist the doctor and take “ care.of all factors pertaining to that room ”. This included checking records, preparation of medication and instruments, and the administering of a skin test for allergy to the dyes used in IVP’s by inserting a hypodermic needle beneath the skin and releasing a small quantity of the dye.
Unless a nurse is specially trained, she is not qualified to perform an IVP, and Miss Stensch had never been so trained. In fact, the medical superintendent testified that, at Morrisania, no nurses were authorized to perform IVP’s, and that this was a function to be performed only by a doctor. Miss Stensch, however, testified that there was no rule of the hospital as to whether or not nurses are authorized to perform IVP’s, but added that she was not authorized to do so.
On entering the cystoscopy room, plaintiff was taken off his wheel chair and placed on a table. Despite his protests against being injected in the right arm, Miss Stensch, without any preliminary tests, according to his testimony, inserted a hypodermic needle into plaintiff’s right arm below the elbow joint on the palmar surface. With the needle in his arm, plaintiff started screaming, but the nurse told him “ you are a baby ”, *229 and did not withdraw the needle until she had finished the injection. When the needle was withdrawn, plaintiff’s arm was black and blue with a feeling “ like I hold electricity ”. He had never had reactions of this nature before. As to whether Miss Stensch had injected him on any prior occasion, plaintiff testified “ I don’t remember exactly. To the best of my memory I had one, I think. Q. One at least? A. Yes, sir.”
Miss Stensch testified that Dr. Valdez, and not she, had made the September 21 injection. The hospital records indicate that an IVP was received by plaintiff on that day, and that Miss Stensch had made the entry to this effect for Dr. Valdez, something which she had never previously done. The X-ray report for that day was unsatisfactory and not filed with the records.
After the injection, plaintiff was lying on the table for a “ couple of hours ” until Dr. Valdez came. He was then returned to his ward, and on the first day following the injection was placed in a special ward with no other patients. His arm was put in a sling and pain relieving drugs and hot and cold packs were administered. This treatment was continued until the last day that he was in the hospital. Prom the time of the injection, he was unable to use his right arm to perform ordinary daily functions. He has been unable to work at his usual occupation since that time.
The hospital record contains entries of no complaints and no pain on three days following the injection, and contains no reference to the injured arm until October 5, when an entry was made that plaintiff ‘ ‘ still complains of arm pain ’ ’. On October 6 there is an entry recommending a neurological consultation on the basis of the finding of extravasation (flow outside the vein for which it was intended) of the dye used for the IVP and evidence of ulna nerve palsy (paralysis). Plaintiff was examined by a neurologist on October 8. He found an injury to the median nerve, a nerve running down the arm in the vicinity of the vein into which dye is injected for an IVP and having to do with the control of the hand, resulting in a nerve disorder known as causalgia.
Plaintiff was released from Morrisania Hospital on October 13. On October 19 he was admitted to Mount Sinai Hospital, and received neurological treatment there for the injury to the right arm up to the' date of trial. A neurologist from Mount *230 Sinai described plaintiff’s injury in greater detail, stating also that nerve surgery known as sympathectomy was recommended. In his opinion the injury is permanent, and the IVP performed by Miss Stensch on September 21 was a competent producing cause thereof. Plaintiff’s other medical witness described the procedure for properly performing an IVP, which included: preliminary tests for sensitivity, visualization of the vein and drawing blood before injection of the dye, and immediate withdrawal of the needle when there is a reaction such as screaming.
Giving plaintiff the benefit of every favorable inference reasonably to be drawn from the evidence (Bryant v. Presbyterian Hosp., 304 N. Y. 538, 541), there is ample evidence on which a jury could find that the nurse, an employee of the City of New York, negligently injected a dye into plaintiff’s arm while he was a patient at Morrisania City Hospital and that, as a result, plaintiff sustained severe and permanently disabling injuries.
The city contends that there is no evidence of any negligence in the administration of the hospital, that at best the injection was a medical act, and that it cannot be held liable under the doctrine of respondeat superior. Plaintiff maintains that the city was negligent in the administration of the hospital, and particularly so in that it failed to establish proper procedures to provide qualified personnel to perform an IVP, and to prevent unqualified nurses from undertaking such an injection themselves.
There is no evidence that the nurse was not qualified for her position as head of the cystoscopy room or that the hospital was negligent in her selection. Other than plaintiff’s uncertain testimony that the nurse injected him on one prior occasion, there is no evidence that anyone other than a qualified physician had ever performed an IVP on any prior occasion or was authorized to do so by the hospital rules. This is not sufficient evidence upon which to base a finding that a course of conduct existed, of which the hospital is charged with knowledge, by which unqualified nurses perform such injections. It is true that the hospital rules did not specifically prohibit nurses from performing IVP’s, but this is not equivalent to authorizing them to do so. Aside from the question of whether such a rule would have prevented the nurse in this case from acting as plaintiff claims she did (she conceded she was not authorized), to require a *231 hospital specifically to prohibit nurses from undertaking a medical act for which they are concededly not qualified and which only physicians are authorized to perform, would not be reasonable. Specific rules to cover each of such acts would be myriad — indeed it would be exceedingly difficult if not impossible to provide rules to encompass them all.
Plaintiff also seeks to find negligence in the administration of the hospital in overcrowded and understaffed conditions and in improper treatment of the injury. The only evidence on the issue of overcrowding is plaintiff’s testimony that there were 40 or 50 patients in the urology ward and only 1 or 2 nurses in attendance. Whether or not this would be overcrowding, there is no evidence that these conditions were in any way responsible for the actions of the nurse in the cystoscopy room. On the issue of improper treatment, plaintiff himself testified that he had received some medical attention beginning the first day following his injury, although he was not seen by a neurologist until two weeks later. There is no evidence that this treatment was improper or that it contributed in any way to plaintiff’s injuries.
We conclude that the evidence would not support a finding of negligence on the part of the city in the administration of the hospital. Plaintiff’s major contention, however, is that, even though there be no administrative negligence, the city is liable for the act of the nurse under the doctrine of respondeat superior.
Of course, under that doctrine, the act of the employee for which the employer is sought to be held liable may not be outside the general scope of the employment or done with a purpose foreign to the interests of the employer (Sauter v. New York Tribune, 305 N. Y. 442, 444; Ford v. Grand Union Co., 268 N. Y. 243). Such is not the situation in this case. The nurse had been placed in charge of the cystoscopy room. Her duty, as already noted, was to “ see that everything is run properly in that room ” and to take “ care of all factors pertaining to that room ”. She daily performed numerous acts closely related to the act complained of, including the injection of dye into the skin. In performing the injection which injured plaintiff, there is every indication that she was acting in furtherance of her employer’s interests and not her own. It is true that she was not specifically authorized to perform the injection, but, as was stated *232 in the oft-cited case of Rounds v. Delaware, L. & W. R. R. Co. (64 N. Y. 129, 134): “ It is not the test of the master’s liability for the wrongful act of the servant, from which injury to a third person has resulted, that he expressly authorized the particular act and conduct which occasioned it. In most cases where the master has been held liable for the negligent or tortious act of the servant, the servant acted not only without express authority to do the wrong, but in violation of his duty to his master.” (See McLoughlin v. New York Edison Co., 252 N. Y. 202, 205; Osipoff v. City of New York, 286 N. Y. 422.) The degree of responsibility conferred upon the employee is an important consideration in determining scope of employment, for, as the court put it in Cohen v. Dry Dock, E. B. & B. R. R. Co. (69 N. Y. 170, 173): “ The master who puts the servant in a place of trust or responsibility * * * is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper * * * goes beyond the strict line of his duty or authority, and inflicts an unjustifiable injury upon another.” (See De Wald v. Seidenberg, 297 N. Y. 335, 338.) We believe the question as to whether the nurse was acting within the scope of her employment in performing the injection was at least one for the jury.
Having determined that the jury could find that plaintiff was injured as the result of the negligent act of an employee of the city acting within the scope of her employment and in furtherance of the master’s business, we are faced with the necessity of determining whether the city may nevertheless escape liability in this case solely because the employee was performing medical duties in one of its hospitals.
Under the rule of Schloendorff v. Society of N. Y. Hosp. (211 N. Y. 125), as applied in subsequent cases, a hospital has been held immune from liability predicated on the doctrine of respondeat superior, when a patient at the hospital is injured as the result of a medical act performed by an employee of the hospital in the course of treating the patient. The IVP performed by the nurse in this case is such a medical act (Bryant v. Presbyterian Hosp., supra, 304 N. Y. 538, 541). The theory of implied waiver by the beneficiary of a charity formerly used to support the rule has been abandoned (Sheehan v. North Country Community Hosp., 273 N. Y. 163; Phillips v. Buffalo Gen. Hosp., 239 N. Y. 188); and the rule has been extended to *233 profit-making as well as charitable institutions (Bakal v. University Heights Sanitarium, 277 App. Div. 572, affd. 302 N. Y. 870; see Mrachek v. Sunshine Biscuit, 308 N. Y. 116).
The rationale for the rule employed is that the hospital employee when performing a medical act is an independent contractor as to the patient, so that the hospital cannot be held liable under the doctrine of respondeat superior. The theory is that the hospital does not undertake to heal but merely to make healers available (Schloendorff v. Society of N. Y. Hosp., supra; see Hamburger v. Cornell Univ., 240 N. Y. 328, 336). This rationale has been applied although, according to generally applicable rules of law, the hospital employee would not be considered an independent contractor (see Matter of Bernstein v. Beth Israel Hosp., 236 N. Y. 268, 270-271).
The rule was recently questioned by us in Berg v. New York Soc. for Relief of Ruptured & Crippled (1 N Y 2d 499), Judge Desmond, rendering the opinion of the court, stating (pp. 502-503):
“ Modern hospitals hire on salary not only clerical, administrative and housekeeping employees but also physicians, nurses and laboratory technicians of many kinds. Not only do they furnish room and board to patients but they sell them services which are ‘ medical ’ in nature and, though furnished on physicians’ orders, are performed wholly by and under the control of the hospitals ’ salaried staffs. What reason compels us to say that of all employees working in their employers’ businesses (including charitable, educational, religious and governmental enterprises) the only ones for whom the employers can escape liability are the employees of hospitals?
“ Whatever be the ultimate fate of the Schloendorff rule, this case need not be pushed into the Schloendorff mold.”
(See, also, Bryant v. Presbyterian Hosp., supra, p. 544.) Nor will it be necessary for us to decide the “ultimate fate of the Schloendorff rule ” in this case, for this court has held that the rule is not applicable to negligent employees where the hospital involved is operated by the State, which includes a subdivision thereof.
In Liubowsky v. State of New York (260 App. Div. 416) a patient at a State hospital died as the result of the injection of a wrong drug by a physician aided by a nurse. That court *234 declined to follow the Schloendorff rule, holding (p. 418): “ Section 12-a [now § 8] of the Court of Claims Act in effect provides that the doctrine of respondeat superior does apply to the State; hence the cases cited by the State in its brief are no longer an authority under the set of facts existing in this case.” On appeal to this court, we unanimously affirmed the judgment below (285 N. Y. 701). In Robison v. State of New York (292 N. Y. 631) we again unanimously affirmed, without opinion, a judgment against the State for negligent medical care of a State employee by a State physician. We rejected the argument of the State, which sought to apply the Schloendorff rule, on the ground that the basis for the rule, namely, that a physician is an independent contractor, was not applicable to the relation between the State and its physicians by reason of section 8 of the Court of Claims Act. The same view had been taken by the Appellate Division when it reversed and remitted the matter to the Court of Claims earlier in the same case (supra, 263 App. Div. 240). The court there stated (p. 243): “The State is bound not only by the duty of not neglecting its administrative functions to provide proper facilities and competent employees (physicians and nurses) (see Schloendorff v. New York Hospital, 211 N. Y. 125), but further has made itself responsible for the negligence of such employees, apparently even though the employees are physicians and nurses. (See Liubowsky v. State of New York, supra [285 N. Y. 701]; Turack v. State of New York, supra [285 N. Y. 737]; Torrey v. State of New York, 175 Misc. 259, 262.) ”
In Kaplan v. State of New York (198 Misc. 62), the Court of Claims based its decision in claimant’s favor on the Liubowsky and Robison cases. The Appellate Division affirmed in 277 App. Div. 1065 (Third Dept.), on the ground that the State assumed a sufficient administrative control of the claimant’s course of treatment after an operation, without deciding the question of the State’s liability under section 8 of the Court of Claims Act. However, in McCrossen v. State of New York (277 App. Div. 1160 [Fourth Dept.]), decided the following month, the court based its opinion in claimant’s favor on the grounds that both the physician in charge (for professional neglect) and the warden (for an administrative act) were negligent, and therefore the State was liable. Leave to appeal was denied by us in both of those cases together (302 N. Y. 949, 950).
*235 Section 8 of the Court of Claims Act has been expressly held to be equally applicable to the subdivisions of the State, such as the City of New York, as to the State itself, despite the existence of specific provisions for liability in the General Municipal Law (Bernardine v. City of New York, 294 N. Y. 361, 365). The rule of the Liubowsky and Robison cases is therefore as applicable to a city hospital as to a State hospital.
In Schmid v. Werner (303 N. Y. 754, affg. 277 App. Div. 520), we upheld the dismissal of a complaint made at the opening of the case in a suit by a patient injured in a New York City hospital as a result of the negligence of doctors employed by the hospital. But the question before us was not raised below, and only the applicability of section 50-d of the General Municipal Law was considered.
The rule of the Robison and Liubowsky cases — that the effect of section 8 of the Court of Claims Act is to make the State and its subdivisions liable, under the doctrine of respondeat superior, for the negligent acts of its paid employees, including nurses employed by it in its hospitals — requires a reversal here. It is true that such a holding imposes a liability upon the State and its subdivisions for the medical acts of its hospital employees, while, under the so-called Schloendorff rule, nongovernmental hospitals were held exempt from liability arising from the same acts. That rule treats persons, who by all other tests are clearly employees, as independent contractors when they are engaged in the performance of a medical act. In enacting the Court of Claims Act, the Legislature did not intend to apply such rule to the State and its subdivisions. We said in Jackson v. State of New York (261 N. Y. 134, 138) that the statute “ waives immunity not only from suit but also from liability ”, and constitutes a “ recognition and acknowledgment of a moral duty demanded by the principles of equity and justice. It includes only claims which appear to the judicial mind and conscience to be such as the Legislature may declare to be affected by a moral obligation and which the State should satisfy. (Farrington v. State, 248 N. Y. 112, 115.) It declares that no longer will the State use the mantle of sovereignty to protect itself from such consequences as follow negligent acts of individuals. It admits that in such negligence cases the sovereign ought to and promises that in future it will voluntarily discharge its moral obligations *236 in the same manner as the citizen is forced to perform a duty which courts and Legislatures have so long held, as to him, to be a legal liability. It transforms an unenforceable moral obligation into an actionable legal right and applies to the State the rule respondeat superior.” It is a declaration by the State of a public policy “ that persons damaged by the torts of those acting as its officers and employees need not contribute their losses to the purposes of government ” (Sheehan v. North Country Community Hosp., 273 N. Y. 163, 166, supra). Under this enactment, all persons who are employees of the State are treated as such, and the doctrine of respondeat superior is applied to determine whether the State is liable.
Accordingly, the judgments of the Appellate Division and Trial Term should be reversed and a new trial granted, with costs to abide the event.
Conway, Ch. J., Desmond, Dye, Fuld and Van Voorhis, JJ., concur; Burke, J., taking no part.
Judgments reversed, etc.